**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JASON M. BOOTHE, | ) | CASE NO. 5:13-CV-21 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Jason M. Boothe ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

On March 10, 2009, Plaintiff filed his application for SSI and alleged a disability onset date of March 2, 2009.  (Transcript ("Tr.") 15.)  The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id*.)  On March 30, 2011, an ALJ held Plaintiff's hearing.  (*Id*.)

---

[1]    On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.  She is automatically substituted as the defendant in this case pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.  (*Id.*)  On April 8, 2011, the ALJ found Plaintiff not disabled.  (Tr. 15-25A.)  On November 8, 2012, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On January 4, 2013, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 16, 17.)  Plaintiff argues that – for various reasons –  substantial evidence does not support the ALJ's determination of Plaintiff's residual functional capacity ("RFC"); and that the ALJ erred in concluding that Plaintiff was capable of performing his past relevant work.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born on August 19, 1982 and was 26 years old on the date he filed his application.  (Tr. 24.)  He had at least a high school education and was able to communicate in English.  (*Id.*)  In an undated Disability Report, Plaintiff indicated that, from August 1998 until June 2001, he had worked as a cook in a restaurant, where his duties included "cook[,] prep cook[,] wash dishes[, and] unload trucks."  (Tr. 63.)

### B.    Relevant Medical Evidence

#### 1.    Plaintiff's Treating Providers

On October 19, 2007, Frederick G. Leidal, Psy.D., examined Plaintiff at the request of the state vocational rehabilitation services.  (Tr. 414-24.)  Plaintiff described

2

a history of psychiatric treatment, including diagnoses of post-traumatic stress disorder and intermittent explosive disorder.  (Tr. 415.)  Plaintiff reported feeling angry for most of his life, and having problems controlling his temper, often launching into tirades and getting into violent fights.  (*Id*.)  Plaintiff acknowledged that he did not consistently attend counseling appointments, and that he did not then feel like attending counseling. (Tr. 416.)  He also admitted that he did not take his medication as prescribed.  (*Id*.) Plaintiff described an extensive history of abusing drugs and alcohol, including marijuana, mushrooms, LSD, and cocaine.  (*Id*.)

Dr. Leidal observed that Plaintiff was "unable to attend to questions without giving the impression of being at least mildly distracted or impaired in some way."  (Tr. 416.)  He rated Plaintiff's intelligence as being in the low average range of mental functioning.  (Tr. 417.)   Dr. Leidal conducted a personality test, the Minnesota Multiphasic Personality Inventory ("MMPI-2"), and noted that Plaintiff's profile suggested that Plaintiff was malingering:

> This is a profile that would typically be interpreted as a fake bad profile or 'malingering' . . . .  Patients who approach the MMPI-2 in this manner usually are not seriously psychiatrically disturbed, although this does not rule out that they may have psychiatric problems.  This patient likely responded consistently although not honestly to the items on the MMPI-2.  The profile is so exaggerated that the basic scales would be considered invalid for normal interpretation and suggest the patient may be malingering or at least partially malingering for some type of secondary gain or attention.  The profile may also be an attempt to exaggerate existing symptoms for some extrinsic incentive.  Many patients with this type of response to the MMPI have psychiatric problems that are characterological in nature, and, in addition, need to be seen as "sick" or "ill" or dependent in some way, as they either feel they can't cope with life stress, don't want to work, or need benefits.

3

(Tr. 420.)

On April 2, 2009, Plaintiff's family physician, John K. Miller, M.D., reported to the state agency that he had "followed [Plaintiff] for many years," and noted that Plaintiff had "multiple medical problems, the most severe of which relate to his bipolar disorder and his recurrent venous thrombosis with pulmonary embolism in the past."  (Tr. 436.) Dr. Miller stated that, although Plaintiff had received mental health treatment in the past, at that time, Plaintiff was not "seeing anybody and has been doing reasonably well on minimum medication."  (*Id*.)  Dr. Miller reported that Plaintiff had complied well with treatment and medication regimens.  (*Id*.)  Dr. Miller characterized Plaintiff's condition as "relatively stable overall."  (Tr. 437.)  However, Dr. Miller opined that Plaintiff was not capable of working:

> I believe he has ongoing medical problems, part of which are true physical issues and part of which are exacerbated by his emotional condition, including an element of bipolar.  I do not think, at this time, he is able to maintain a job on any kind of regular basis, although I would hope in the future this might be a possibility.  His inability to work relates to his morbid obesity, his emotional instability, and his problems with recurrent blood clots which would make certain kinds of work difficult for him to do.

(*Id*.)

During examinations In June 2009, Dr. Miller described Plaintiff's mental status as alert and oriented.  (Tr. 470, 473.)  On July 27, 2009, Plaintiff told Dr. Miller that he was hearing voices telling him to harm himself, experiencing mood swings and having thoughts of harming himself and others.  (Tr. 468.)  He reported that he had recently choked someone after that person looked at him "the wrong way."  (*Id*.)  Plaintiff denied

4

having taken any illegal drugs, and claimed to be compliant with his medications.  (*Id*.)
Dr. Miller prescribed Seroquel and recommended that Plaintiff go to a counseling center
for assistance.  (Tr. 469.)

On August 3, 2009, Plaintiff reported to Dr. Miller that the Seroquel was helping,
but that he continued to hear voices.  (Tr. 467.)  He told Dr. Miller that he had recently
attempted to attack someone who had angered him, and that he felt like hurting the
person for no apparent reason.  (*Id*.)  On August 6, 2009, Plaintiff reported to the
emergency department at Wooster Community Hospital ("WCH"), complaining of
auditory hallucinations in the form of voices telling him to harm people, and of the
sensation that insects were crawling over his skin.  (Tr. 492.)  After a psychiatric
evaluation, Plaintiff was transferred to Heartland Behavioral Healthcare ("Heartland").
(Tr. 583.)

Physicians at Heartland diagnosed Plaintiff with hallucinogen-induced psychotic
disorder, mood disorder (not otherwise specified), hallucinogen abuse, and antisocial
personality disorder.  (*Id*.)  However, during his treatment there, staff noted that Plaintiff
"indicated that he has applied for disability and the lawyers have told him [that], bas[ed]
upon the outcome of this hospitalization, he might be awarded his disability."  (Tr. 584.)
Noting that Plaintiff did not appear to be in distress despite "command hallucinations,"
physicians noted that "his symptoms did not appear to be genuine."  (*Id*.)  They
administered an MMPI-2, and "that [was] found to be invalid and [staff] became doubtful
about his hallucinations."  (*Id*.)  Physicians opined that Plaintiff's hallucinations were
substance induced.  (*Id*.)  Physicians prescribed Seroquel, Trazodone, Haldon, and

Remeron and discharged Plaintiff from Heartland on August 13, 2009 after his initial symptoms subsided.  (Tr. 585.)

On August 14, 2009, a social worker from the Counseling Center of Wayne and Holmes Counties ("CCWHC") noted that staff at Heartland believed that Plaintiff was "attempting to create symptoms in order to receive benefits," and that a physician at Heartland "feels [Plaintiff] is malingering."  (Tr. 573.)  On August 18, 2009, Plaintiff described a four-week history of auditory, visual, olfactory and tactile hallucinations to a counselor at CCWHC.  (Tr. 563.)  Plaintiff reported mood swings, insomnia, nightmares, anxiety, and depression.  (Tr. 564.)  Plaintiff reported a history of abusing marijuana and LSD, and admitted to having used marijuana within the prior month.  (Tr. 567.)  The counselor diagnosed Plaintiff with intermittent explosive disorder (rule out post-traumatic stress disorder) and psychotic disorder (rule out malingering), and recommended that Plaintiff receive psychiatric services and outpatient counseling for one year.  (Tr. 570.)

On August 19, 2009, Plaintiff cancelled his intake appointment at CCWHC.  (Tr. 572.)  He cancelled a second appointment on August 28, 2009.  (Tr. 561.)

On August 31, 2009, Plaintiff reported to Dr. Miller that his drinking had increased, that he was drinking six to eight drinks each day to "keep from hurting others," and that he was smoking marijuana.  (Tr. 464.)  Plaintiff claimed to have stabbed someone with a pair of scissors the day before.  (*Id.*)  Plaintiff was experiencing hallucinations and felt like "something was under [his] skin."  (*Id.*)  Dr. Miller prescribed Mirtazapine, Trazodone, and Haloperidol.  (Tr. 465.)

On September 4, 2009, Plaintiff was transferred from WCH to Barberton Hospital

6

after he presented to the emergency department at WCH with suicidal and homicidal ideations.  (Tr. 488, 622-25.)  He was admitted for treatment in the psychiatric unit.  (Tr. 488, 622.)  Physicians diagnosed Plaintiff with visual and auditory hallucinations and schizophrenia.  (Tr. 625.)  He underwent reality-oriented psychotherapy, milieu therapy, and medication and activity therapy.  (Tr. 622.)  Plaintiff "gradually improved" and was discharged on September 9, 2009.  (*Id*.)  At the time of his discharge, he reported no hallucinations, delusions, agitations or thoughts of hurting people.  (*Id*.)  Plaintiff expressed an intention to be compliant with his medication.  (Tr. 488.)

On September 11, 2009, Plaintiff cancelled an appointment at CCWHC.  (Tr. 550.)

On September 14, 2009, Plaintiff reported to Dr. Miller that his depression and mood changes were improving, but that he continued to experience insomnia.  (Tr. 461.)  Dr. Miller noted that Plaintiff was alert and oriented.  (Tr. 462.)  He recommended that Plaintiff continue on the Seroquel.  (*Id*.)

On September 18, 2009, Plaintiff cancelled an appointment at CCWHC.  (Tr. 549.)  He failed to attend an appointment on October 2, 2009.  (Tr. 548.)  On November 2, 2009, Plaintiff reported that he was "doing ok[ay] with some good things going on and some bad things going on."  (Tr. 547.)  He felt that the Seroquel was effective, although he still experienced auditory and tactile hallucinations and sleep problems.  (*Id*.)

On February 16, 2010, Andrew CJ Santora, Ed. D., CNS, APN, an advanced practice nurse at CCWHC assessed Plaintiff, who reported an increase in his homicidal ideations, hallucinations and insomnia.  (Tr. 672.)  On March 18, 2010, Plaintiff reported that, despite his compliance with his medication regimen, he continued to experience

7

violent outbursts and severe sleep problems.  (Tr. 671.)  Nurse Santora changed Plaintiff's medications to Saphris and Trazodone.  (*Id*.) On April 12, 2010, Plaintiff reported an allergic reaction to the new medications, as well as increased agitation and restlessness, and continued hallucinations and sleep problems.  (Tr. 670.)  Nurse Santora discontinued Plaintiff's Saphris, and prescribed Risperdal.  (*Id*.)  On April 29, 2010, Plaintiff reported that the Risperdal decreased his hallucinations, but had not eliminated it.  (Tr. 669.)  Plaintiff complained of increased anger.  (*Id*.)  Nurse Santora prescribed Paxil and Gabapentin.  (*Id*.)

On May 14, 2010, Plaintiff reported a "significant improvement" in his sleep and energy level, but noted that his depression and anger had increased, and that he was isolating himself.  (Tr. 668.)  Nurse Santora increased Plaintiff's dosage of Paxil.  (*Id*.) He described Plaintiff as having fair to poor memory and concentration, and poor insight and judgment.  (*Id*.)  On June 10, 2010, Plaintiff reported increased homicidal ideation and suicidal ideation.  (Tr. 667.)  Nurse Santora discontinued Plaintiff's Risperdal, prescribed Geodon, and continued Plaintiff's Paxil, Gabapentin and Trazodone.  (*Id*.)

On June 22, 2010, Plaintiff was admitted to the psychiatric unit at Barberton Hospital after a physical altercation with his neighbor.  (Tr. 604.)  Plaintiff complained of nightmares and auditory hallucinations.  (*Id*.)  Plaintiff underwent reality-oriented psychotherapy, milieu therapy, and medication and activity therapy, and gradually improved.  (*Id*.)  Physicians prescribed Neurontin, Geodon, Trazodone and Paxil.  (Tr. 604-05.)  Plaintiff was discharged on June 26, 2010, when physicians described him as

8

coherent and relevant, and reporting no hallucinations, delusions or suicidal or homicidal ideations.  (Tr. 605.)

On September 7, 2010, Nurse Santora noted that Plaintiff had failed to attend his July 8, 2010 appointment.  (Tr. 687.)  Nurse Santora noted Plaintiff's report that he was not doing well, with increased paranoid ideation and psychotic features.  (*Id*.)  Nurse Santora increased Plaintiff's dosage of Geodon.  (*Id*.)  Plaintiff failed to attend an October 5, 2010 appointment with Nurse Santora.  (Tr. 686.)  On November 15, 2010, Plaintiff reported compliance with his medication regimen; although Nurse Santora noted that, having missed his October 2010 medication appointment, Plaintiff should have run out of Geodon.  (*Id*.)  Plaintiff described continued paranoid ideation and hallucinations, but stated that he felt "normal and calm" about one day each week.  (*Id*.)  Nurse Santora discontinued Plaintiff's Geodon and Gabapentin, and prescribed Fanapt.  (*Id*.)

On November 29, 2010, Plaintiff reported that his symptoms had improved on Fanapt.  (Tr. 685.)  However, because his insurance required a preauthorization for continued prescriptions of the medication, Nurse Santora prescribed Abilify.  (*Id*)

On February 22, 2011, Plaintiff was admitted to the psychiatric department of Barberton Hospital after a physical altercation with his wife.  (Tr. 726.)  Plaintiff described homicidal thoughts and visual hallucinations.  (*Id*.)  Physicians prescribed Trazodone, Paroxetine, and Chlorpromazine.  (Tr. 724.)  A discharge assessment reflects that, when Plaintiff was discharged on February 27, 2011, he reported neither

hallucinations nor homicidal ideations.  (Tr. 723.)[2]

### 2.  Agency Reports and Assessments

On April 19, 2009, agency consultant James F. Sunbury, Ph.D., examined Plaintiff.  (Tr. 438-42.)  Plaintiff reported taking Elavil, but denied receiving any counseling since 2008 due to insurance complications.  (Tr. 439.)  Plaintiff described "an extensive history" of substance abuse, including crack and powder cocaine, marijuana, acid, meth and alcohol.  (*Id*.)  Plaintiff reported panic attacks and nightmares, particularly relating to an incident in which he witnessed a man's death during a drug deal.  (Tr. 440.)  Plaintiff described episodes of mania and violence, insomnia and impulsive behavior.  (*Id*.)

Dr. Sunbury observed that Plaintiff was responsive to questions, and that his responses were coherent and relevant.  (Tr. 440.)  Plaintiff was alert and able to recall past events without difficulty.  (Tr. 440-41.)  Dr. Sunbury opined that Plaintiff's insight and intelligence were in the low average range, and that he had poor judgment.  (Tr. 441.)  Dr. Sunbury diagnosed Plaintiff with bipolar disorder (not otherwise specified); anxiety disorder (not otherwise specified); and personality disorder (not otherwise specified) with antisocial, borderline and histrionic features.  (*Id*.)  Dr. Sunbury assigned Plaintiff moderate limitations in the ability to relate to others and withstand the stress and pressure associated with day-to-day work activity.  (Tr. 441-42.)  He assigned

---

[2]     The handwritten notes of Plaintiff's discharge are dated 2010, rather than 2011.  (Tr. 723.)  This appears to be an error by the nurse who prepared the summary, as the computer generated dates on the document are all 2011.  (Tr. 723-24.)  There are no records reflecting that Plaintiff was admitted to Barberton Hospital in February 2010.

10

Plaintiff a mild limitation in the ability to maintain attention, concentration, persistence and pace.  (Tr. 442.)  He opined that Plaintiff was not limited in his ability to understand, remember and follow instructions.  (Tr. 441.)

On April 29, 2009, agency consultant David Demuth, M.D., performed a mental residual functional capacity ("RFC") assessment and a psychiatric review technique (Tr. 443-46; 447-60.)  In Section I of the assessment, Dr. Demuth opined that Plaintiff was moderately limited in the ability to: understand and remember detailed instructions; carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.  (Tr. 443-44.)  In Section III of the assessment, Dr. Demuth opined that Plaintiff retained the capacity to perform "simple to moderately complex tasks in a non-public, routine setting without strict time frames or production standards and occasional, superficial interactions with coworkers and supervisors."  (Tr. 445.)

In the psychiatric review technique, Dr. Demuth diagnosed Plaintiff with bipolar syndrome and anxiety disorder.  (Tr. 450, 452.)  He opined that Plaintiff was mildly limited in his activities of daily living, and moderately impaired in maintaining concentration, persistence and pace; and maintaining social functioning.  (Tr. 457.)

On January 11, 2010, agency consultant Todd Finnerty, Psy. D., performed a

11

case analysis.  (Tr. 587.)  He affirmed Dr. Sunbury's findings, noting that Plaintiff's allegations that his symptoms were increasing in severity were not fully supported, "particularly given the opinions of those who saw him at Heartland."  (*Id.*)

**C.    Hearing Testimony**

**1.    Plaintiff's Hearing Testimony**

At his March 30, 2011 administrative hearing, Plaintiff testified as follows:

Plaintiff "sometimes" lived in an apartment with his wife, as the building manager was concerned that Plaintiff was dangerous because Plaintiff had broken a neighbor's jaw.  (Tr. 746-47.)  Plaintiff could not recall whether he had worked since March 2009.  (Tr. 748-49.)  He explained that a physician had recently prescribed him Thorazine, which "slowed down" his mind and made it difficult for him to understand things.  (Tr. 750.)

Plaintiff was not capable of working due to his hallucinations, which interfered with his ability to focus on what he was supposed to be doing.  (Tr. 755-56.)  Plaintiff was smoking a half pack of cigarettes each day, although he was trying to quit.  (Tr. 756.)  Plaintiff had hallucinations every day.  (Tr. 759.)  When he left the hospital after his most recent admission, he was still seeing hallucinations.  (*Id.*)  Plaintiff's hallucinations generally involved seeing blood running down the walls.  (Tr. 755.)  When he experienced this hallucination – which made him "really, really happy" – he felt a strong desire to "see more [blood] and more of it as much as I can."  (Tr. 755-56.)  Plaintiff's desire for bloodshed went "to the point of making myself . . . bleed or making someone that comes near me bleed."  (Tr. 756.)  He had last cut himself to make

himself bleed a few weeks before the hearing, but had not gone to the hospital.  (*Id*.)

Plaintiff did not like being around other people, as he felt that they watched him and wanted "to get" him.  (Tr. 760.)  He had problems sleeping, either in being unable to fall asleep or in having nightmares.  (*Id*.)  Plaintiff had been fired from jobs for shoving his supervisors, and had once thrown a pizza pan at his manager's head.  (Tr. 761-62.)  He had spent 10 days in jail in 2007 after stabbing someone, but had been released when police were unable to locate the victim.  (Tr. 762.)

Plaintiff drank a glass of wine once each week.  (Tr. 765.)  He had used cocaine, marijuana, LSD and crystal meth in the past.  (*Id*.)  He had meetings of attended Narcotics Anonymous and Alcoholics Anonymous.  (Tr. 766.)

### 2.    Testimony Regarding Plaintiff's Vocational History

The ALJ described the following hypothetical individual:

> [Plaintiff's] age, education and work experience with the [RFC] to perform work at all exertional levels that are simple, repetitive and routine in a non-public setting without strict time frames or production standards and occasional, brief, superficial interaction with coworkers and supervisors.

(Tr. 775-76.)  The VE opined that the hypothetical individual would be able to perform work as cleaner, kitchen helper and laundry worker.  (Tr. 776.)  The VE then asked whether an individual with "limitations consistent as testified" would be able to perform work at any jobs available in the national economy.  (*Id*.)  The VE responded that, although "there would be jobs . . . . maintainability would be a huge issue so it would be so severe that there would be no jobs available."  (*Id*.)

Plaintiff's counsel asked the VE whether an individual with the limitations found

13

by agency consultant Dr. Demuth would be able to work.  (Tr. 777.)  The VE responded

that, "once again . . . we're looking at an issue with [maintainability] that it wold probably

be so severe that there would be no jobs available."  (*Id*.)  In response to questioning

from Plaintiff's counsel, the VE agreed that an individual who had been hospitalized as

frequently and for the same duration as Plaintiff would not be able to sustain work.  (Tr.

778.)

        The ALJ then posed an additional hypothetical to the VE:

> Please consider a hypothetical individual of [Plaintiff's] age,
> education, work experience and the [RFC] to perform work
> at all exertional levels that is simple, repetitive and routine.
> With no contact with the public in a low stress environment
> and by low stress I mean without strict time frames, low
> production quotas, does not involve decision making and
> further only involves brief, occasional and merely superficial
> interaction with coworkers and supervisors.

(Tr. 783.)  The VE opined that the hypothetical individual would be able to perform work

as a dishwasher – both as Plaintiff had actually performed it and as it was normally

performed – as well as a cleaner, laundry worker and kitchen helper.  (Tr. 783, 786.)

        Plaintiff's counsel questioned the VE regarding the extent to which an individual

would have greater than superficial contact with a supervisor:

> Q:    Is there such a thing as superficial interaction with
> supervisors who have to in some situations correct
> and criticize and construct and those kinds of things?
> Is that fair to characterize those kinds of interactions
> as being superficial?
>
> A:    They are definitely occasional and brief at times,
> superficial depends on how you – you know describe
> that.  You know, I mean I can't say that there's never
> going to be an occasion where it may be more than
> superficial with a supervisor.  But those are not
> normally everyday type of occasions either so --

14

Q:      Right.

A:      Maybe one time during 90 days for instance.

(Tr. 784.)  The VE testified that, generally, "there's going to be occasions in a person's employment where it may be more than superficial [interaction] with a supervisor."  (Tr. 785.)  The VE opined that, if an individual "could not reliably interact on a consistent basis even with brief and superficial interactions," that individual would not be able to work.  (*Id*.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that

15

"significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Plaintiff has not engaged in substantial gainful activity since March 10, 2009, the application date.

2.    Plaintiff has the following severe impairments: schizoaffective disorder, intermittent explosive disorder, depressive disorder, personality disorder, post-traumatic stress disorder, bipolar disorder, and schizophrenia.

3.    Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.    Plaintiff has the RFC to perform a full range of work at all exertional levels with the following nonexertional limitations: Plaintiff is limited to a jobs process consisting of simple, repetitive, routine tasks, involving no contact with the public, in a low stress environment, defined as having no strict time frames, low production quotas, and no decision making responsibility, and which further requires only brief, superficial and occasional contact with co-workers and supervisors.

16

5.    Plaintiff is capable of performing past relevant work as a dishwasher, having a medium exertional level designation and a specific vocational preparation factor of two.  This work does not require the performance of work-related activities precluded by Plaintiff's RFC.

6.    Plaintiff has not been under a disability, as defined in the Act, since March 20, 2009, the date the application was filed.

(Tr. 17-25.)  The ALJ also made the alternative conclusion, at step five of the sequential analysis, that Plaintiff was capable of performing work as a cleaner, kitchen helper or laundry worker.  (Tr. 25.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

17

(6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.     Plaintiff's Assignments of Error**

Plaintiff argues that substantial evidence does not support the ALJ's decision because, for various reasons, the ALJ erred in assessing the medical evidence in the record, determining Plaintiff's RFC, and concluding that Plaintiff was capable of performing his past relevant work.  The Commissioner generally contends that substantial evidence supports the ALJ's decision.

**1.     Psychiatric Hospitalizations and Selective Consideration**

Plaintiff contends that the ALJ failed to discuss Plaintiff's psychiatric hospitalizations and the impact they had on his ability to sustain work.  Specifically, Plaintiff points to the VE's testimony that an individual who required the same amount of time for hospitalizations would not be able to maintain a job.[3]  Plaintiff also contends that the ALJ selectively considered the evidence in the record, relying on records that showed normal examinations without considering evidence reflecting the symptoms of

---

[3]     Plaintiff also argues that an individual "with this factual history would very likely miss much more work than just the 24 days of hospitalization.  The person would likely experience a period of deterioration leading to the need to be admitted as well as a period of continuing recovery to baseline function following the admission."  (Plaintiff's Brief ("Pl. Br.") at 4.)  However, Plaintiff cites to nothing in the record – or to any medical authority – to support this assertion.

18

Plaintiff's psychiatric impairments.  These arguments are not well taken.

As a preliminary matter, in addition to pointing to evidence that Plaintiff occasionally had normal mental status examinations, the ALJ made reference to Plaintiff's hospitalizations in his decision, noting that these hospitalizations were "[e]ntirely consistent with" Plaintiff's numerous psychiatric diagnoses and his allegations that he experienced auditory and visual hallucinations.  (Tr. 20.)  However, the ALJ concluded that the "medical records provide surprisingly little support" for Plaintiff's allegations.  Specifically, the ALJ pointed to the normal mental status examinations that were present in the record, as well as the significant gaps in Plaintiff's treatment, his tendency not to attend counseling and therapy sessions, and his non-compliance with his medication regimens.  (Tr. 20-21.)  Further, the ALJ noted the testing results in the record that "strongly suggest that [Plaintiff] is exaggerating his symptoms," as well as Plaintiff's inconsistent statements regarding various issues, including whether he continued to hear voices after his hospitalizations and whether he cut himself as a result of his desire to shed his own blood.  (Tr. 21 (noting that Plaintiff's testimony that he continued to experience hallucinations after his most recent hospitalization was inconsistent with his reports to medical providers, and that, despite his testimony that he cut himself, the medical records contained no evidence of cuts or scars that would result).)  The ALJ concluded that, although Plaintiff may not have consciously intended to mislead, "the inconsistencies suggest that the information provided by [Plaintiff] generally may not be reliable."  (Tr. 22.)

Plaintiff does not challenge the ALJ's conclusion regarding his credibility. Further, the ALJ's reasons for finding Plaintiff to be unreliable, and for concluding that

the medical records did not support Plaintiff's allegations regarding his symptoms, are evident in the record.  Plaintiff does not explain how the fact that he was hospitalized multiple times as a result of his psychiatric impairments renders the ALJ's conclusion otherwise unsupported by substantial evidence in the record.  Accordingly, substantial evidence supports the ALJ's conclusion that, despite Plaintiff's hospitalizations, he was capable of working, and these arguments lack merit.

> **2.    The VE's Testimony Regarding Superficial Interaction**

Plaintiff argues that the ALJ failed to discuss or resolve an inconsistency between his conclusion regarding Plaintiff's ability to work and the VE's testimony.  Specifically, Plaintiff points to the VE's testimony that, generally, an individual who works will occasionally be required to engage in interactions with a supervisor that are more than superficial.  According to Plaintiff, this testimony was inconsistent with the ALJ's conclusion that Plaintiff could perform work in the jobs identified by the VE because the ALJ limited Plaintiff to "only brief, superficial and occasional contact" with co-workers and supervisors.

Plaintiff's argument lacks merit.  The VE testified that the hypothetical individual whose limitations the ALJ eventually adopted as Plaintiff's RFC could perform work as a dishwasher, cleaner, laundry worker and kitchen helper.  (Tr. 783.)  During his examination of the VE, Plaintiff's counsel elicited testimony that, generally, individuals who work will be required to engage in interactions with their supervisors that are more than superficial.  Counsel did not, however, inquire whether an individual who could never engage in greater than superficial interactions would be able to perform work in the positions identified by the VE.  In other words, Plaintiff's counsel did not elicit

20

testimony that was specific to the positions identified by the VE.  Accordingly, there was no conflict between the VE's testimony and the ALJ's conclusion in this case, and this argument lacks merit.[4]

### 3.    Dr. Demuth's Opinion

Plaintiff contends that the ALJ erred in failing to explain why he did not adopt the limitations assigned by agency consultant Dr. Demuth, despite giving Dr. Demuth's opinion "significant weight."  Plaintiff argues that this error was prejudicial because the VE testified that an individual subject to the limitations described in Dr. Demuth's report would not be capable of sustaining work.

It is well established that an ALJ is not required to discuss each and every piece of evidence in the record for his decision to stand.  *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  However, where the opinion of a medical source contradicts his RFC finding, an ALJ must explain why he did not include its limitations in his determination of a claimant's RFC.  *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that

---

[4]      In his brief, Plaintiff argues that "never having more than superficial interactions is inconsistent with competitive work, based on VE testimony." (Pl. Br. at 5.)  This is not, however, the VE's testimony.  Rather, during the hearing, Plaintiff's counsel asked the VE whether an individual who "could not reliably interact on a consistent basis even with brief and superficial interactions" could maintain work, and the VE opined that such an individual was incapable of working.  (Tr. 785.)  The limitation of "not on a consistent basis" permits occasional interaction and, thus, Plaintiff mischaracterizes the VE's testimony on this issue.

evidence, if accepted, would change his analysis."). Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

Plaintiff asserts that, because Dr. Demuth's conclusions contradict the ALJ's determination of his RFC, the ALJ was required to explain his decision not to include Dr. Demuth's restrictions in Plaintiff's RFC. Plaintiff's argument fails, however, because Dr. Demuth made these findings in Section I of the mental RFC assessment. (Tr. 443-44.) The agency's Program Operations Manual System ("POMS"), the operational reference used by agency staff to conduct the agency's daily business, provides that "Section I is merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment." POMS DI 24510.060(B)(2)(a).[5] Rather, Section III "is for recording the mental RFC determination. It is in this section that the actual mental RFC assessment is recorded." POMS DI 24510.060(B)(4)(a). "While these administrative interpretations [POMS] are not products of formal rulemaking, they nevertheless warrant respect . . . " *Washington Dep't of Soc. Servs. v. Keffeler*, 537 U.S. 371, 385 (2003). This Court has acknowledged that "Section I of the mental assessment is merely a worksheet that does not constitute the RFC assessment." *Coleman v. Astrue*,

---

[5]     The POMS is available at:
        https://secure.ssa.gov/apps10/poms.nsf/Home?readform (last visited July
        17, 2013).

22

No. 3:10-cv-464, 2010 WL 4955718, *7 (N.D. Ohio Nov. 18, 2010) (White, Mag. J.); *see also* Velez v. Comm'r of Soc. Sec., NO. 1:09-cv-715, 2010 WL 1487599, *6 (N.D. Ohio Mar. 26, 2010) (Gallas, M.J.) ("In general . . . the ALJ is not required to include the findings in Section I in formulating residual functional capacity.").

In this case, in Section III of his RFC assessment, Dr. Demuth concluded that Plaintiff was capable of performing "simple to moderately complex tasks in a non-public, routine setting without strict time frames or production standards and occasional, superficial interactions with coworkers and supervisors."  (Tr. 445.)  This restriction is nearly identical to the RFC calculated by the ALJ, with the exception that the ALJ imposed a greater limitation – restricting Plaintiff to simple, repetitive, routine tasks. The ALJ explained his decision to deviate from Dr. Demuth's opinion in this respect, noting that "the presentation of [Plaintiff] at the hearing and evidence received subsequent to the rendering of [Dr. Demuth's] opinions justifies the additional limitation, to simple tasks only, imposed.  (Tr. 22.)  Because the ALJ's decision was generally consistent with Dr. Demuth's conclusions and Section III of the assessment – and because the ALJ explained his decision not to adopt one part of these conclusions – this argument lacks merit.

Plaintiff argues that the "legal status" of Dr. Demuth's conclusions is irrelevant to his argument because, at the administrative hearing, the VE testified that an individual with all of the limitations assigned by Dr. Demuth in his RFC assessment would not be able to work.  This argument fails, however, because Plaintiff does not point to evidence substantially supporting the conclusion that the ALJ should have ignored Dr. Demuth's recommendation regarding Plaintiff's RFC in Section III and adopted all of the

23

limitations in Section I of the assessment.  The mere fact that the VE testified that an individual with the limitations assigned by Dr. Demuth would not be capable of working is not sufficient to require the ALJ to adopt those limitations in this case.

### 4.    Dr. Miller's Opinion

Plaintiff argues that the ALJ erred in failing to give the opinion of Dr. Miller controlling weight.  Specifically, Plaintiff points to Dr. Miller's opinion regarding Plaintiff's ability to perform work (Pl. Br. at 7), in which he stated:

> I do not think, at this time, he is able to maintain a job on any kind of regular basis, although I would hope in the future this might be a possibility.  His inability to work relates to his morbid obesity, his emotional instability, and his problems with recurrent blood clots which would make certain kinds of work difficult for him to do.

(Tr. 437.)  The ALJ assigned no weight to this opinion, noting that it "touches upon an issue, the resolution of which is reserved to the Commissioner of Social Security, or his designees."  (Tr. 23.)

It is, of course, well established that an ALJ must assign controlling weight to a treating source's opinion "if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  However, it is equally well established that certain issues are reserved to the Commissioner for determination.  *See* 20 C.F.R. § 416.927(d).  Among these are whether a claimant is disabled.  *See* 20 C.F.R. § 416.927(d)(1) ("We are responsible for making the determination or decision whether you meet the statutory definition of

24

disability. . . .   A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").

In this case, the ALJ properly declined to grant any weight to Dr. Miller's opinion because that opinion addressed Plaintiff's ability to work, which is an issue reserved for determination by the Commissioner.[6]  Plaintiff argues that "most of Dr. Miller's opinions were about the nature of severity" of Plaintiff's impairments and, thus, the ALJ erred in failing to give them controlling weight.  Plaintiff, however, fails to point to any specific opinion expressed by Dr. Miller other than his statement that Plaintiff was not able to work as a result of his impairments.  Although Dr. Miller's records are included in the administrative transcript in this case, they reflect the treatments Plaintiff received from Dr. Miller.  They do not reflect his opinions or impressions of the severity of Plaintiff's impairments, or of Plaintiff's limitations.  Plaintiff does not explain how these records require a different RFC and, more importantly, a different outcome in this case.  Accordingly, this argument lacks merit.[7]

---

[6]     The Commissioner argues that the ALJ properly declined to grant controlling weight to Dr. Miller's opinion because it was inconsistent with the evidence in the record.  (Commissioner's Brief ("Comm'r. Br.") at 17.) The ALJ did not discuss this issue in determining the weight to assign to Dr. Miller's opinion.  .  It is well settled, however, that "'an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *Berryhill v. Shalala*, 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993) (unpublished opinion) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50 (1983) (citation omitted)).  Accordingly, this Court "may not accept appellate counsel's *post hoc* rationalizations for agency action." *Id*. (internal quotation marks omitted).

[7]     In the heading of the section of Plaintiff's Brief devoted to this argument, Plaintiff also asserts that the ALJ erred by "giving the greatest weight to non-examining doctors who reviewed an importantly incomplete record."

**5.      Concentration, Persistence and Pace**

Plaintiff argues that the ALJ failed to sufficiently account for Plaintiff's limitations

in maintaining concentration, persistence and pace in determining Plaintiff's RFC.

Plaintiff correctly notes that, at step three of the sequential analysis, the ALJ

determined that Plaintiff had moderate difficulties in this area.  (Tr. 18.)  The ALJ

assigned the following non-exertional limitations to Plaintiff in his RFC:

> [Plaintiff] is limited to a jobs process consisting of simple,
> repetitive, routine tasks, involving no contact with the public,
> in a low stress environment, defined as having no strict time
> frames, low production quotas, and no decision making
> responsibility, and which further requires only brief,
> superficial and occasional contact with co-workers and
> supervisors.

(Tr. 19.)

Plaintiff contends that the ALJ's non-exertional limitations fail to adequately

address Plaintiff's moderate limitations in concentration, persistence and pace.  To

support his argument, Plaintiff cites to numerous decisions from this Court concluding,

in each case, that the ALJ's determination of the claimant's RFC does not adequately

address the claimant's moderate limitations in this area.  (Pl. Br. at 8.)  However, none

of these decisions compels remand in this case.  Rather, in each of the decisions cited

---

(Pl. Br. at 6.)  He reiterates this contention in the heading of the
corresponding section in his Reply Brief. (Reply Brief at 5.)  However,
Plaintiff does not address this argument in the body of either brief.
Accordingly, this Court considers this argument to be perfunctory and
conclusory, and, thus, waived.  *See Rice v. Comm'r of Soc. Sec.*, 169 F.
App'x 452, 454 (6th Cir.2006) ("It is well-established that 'issues averted
to in a perfunctory manner, unaccompanied by some effort at developed
argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey*, 125
F.3d 989, 995–996 (6th Cir.1997)).

by Plaintiff, the ALJ either entirely omitted non-exertional limitations, *see Thompson v. Astrue*, No. 3:10-cv-1688, 2011 WL 3298904 (N.D. Ohio Aug. 2, 2011) (White, M.J.); *McNemar v. Comm'r of Soc. Sec.*, No. 1:10-cv-2079, 2011 WL 5586378 (N.D. Ohio Nov. 15, 2011) (Adams, J.); or only limited the claimant to simple, routine, repetitive work, which addressed the claimant's limitation in concentration without addressing the claimant's limitations in persistence and pace, *see Alexander v. Comm'r of Soc. Sec.*, No. 3:11-cv-1254, 2012 WL 1658707 (N.D. Ohio May 11, 2012) (White, M.J.); *Candela v. Astrue*, No. 1:10-cv-1603, 2011 WL 3205726 (N.D. Ohio July 28,2011) (White, M.J.); *Miller v. Comm'r of Soc. Sec.*, No. 1:09-cv-2369, 2011 WL 4943954 (N.D. Ohio Oct. 17, 2011) (Baughman, M.J.); *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010). Here, the ALJ limited Plaintiff to simple, repetitive, routine tasks – which addressed his moderate limitation in concentration – performed in a low stress environment without strict time frames and with low production quotas – which addressed his limitations in persistence and pace.

Plaintiff points to no legal authority holding that the restrictions assigned by the ALJ in this case were insufficient to address Plaintiff's limitations.  He points to no evidence in the record that supports a need for additional or greater non-exertional limitations.   Indeed, other than conclusorily asserting that the restrictions are insufficient, he fails to argue or explain how the restrictions failed to account for Plaintiff's non-exertional limitations.  Accordingly, this argument lacks merit.

### 6.    Plaintiff's Past Relevant  Work

Plaintiff argues that the ALJ erred in concluding that he could perform his past

relevant work as a dishwasher because the record does not show that Plaintiff's performance of the work was sufficient to constitute substantial gainful activity and because the ALJ failed to conduct a function-by-function comparison of Plaintiff's RFC with the demands of the position.  This Court, however, need not address these arguments.  Plaintiff does not challenge the ALJ's alternative conclusion that, even if Plaintiff is not capable of performing work as a dishwasher, he was capable of performing other jobs in the national economy.  Accordingly, to the extent that the ALJ erred in determining that Plaintiff could return to his past work as a dishwasher, any error would be harmless and does not require remand in this case.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED


**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: July 18, 2013

28